# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

PAUL T. GOODWIN,                    )
                                    )
       Petitioner,              )
                                    )
   vs.                           )          Case No. 4:06CV848 HEA
                                    )
DON ROPER,                          )
                                    )
       Respondent.              )


## MEMORANDUM AND ORDER

This matter is before the Court on the petition of Paul T. Goodwin for writ

of habeas corpus pursuant to 28 U.S.C. § 2254. This is a capital case. For the

reasons set forth below, the petition is denied.

### Factual Background

The following statement of the facts giving rise to petitioner's trial and

conviction are taken from the Missouri Supreme Court opinion affirming the denial

of post-conviction relief. *Goodwin v. State*, 191 S.W.3d 20 (Mo. 2006) (banc).

Additional facts taken from the Missouri Supreme Court opinion on direct appeal

have been inserted. *State v. Goodwin*, 43 S.W.3d 805 (Mo. 2001) (banc).

> In the summer of 1996, Goodwin moved into a boardinghouse near
> Hanley Road in St. Louis County. The boardinghouse was next door
> to Mrs. Joan Crotts's home. Within a week or so of his arrival at the

boardinghouse, Goodwin began confronting Mrs. Crotts. Goodwin continued to insult and curse her throughout the summer. In August, Goodwin was having a barbecue in the backyard of the boardinghouse and began throwing beer cans over the fence into Mrs. Crotts's yard. When Mrs. Crotts came out to complain, Goodwin picked up a sledgehammer and smashed a rock with it saying: "This is your head . . . if you keep messing with me."

A short time later, Mrs. Crotts left her home to attend a social function. Goodwin confronted her in the driveway and yelled: "Get your fat ass back in the house, bitch. I've got one coming for you." Mrs. Crotts's (adult) daughter intervened and ended the confrontation, but Goodwin was evicted from the boardinghouse. As he left the boardinghouse, he said to Mrs. Crotts: "I am going to get you for this, bitch."

A year and a half later (March 1, 1998), Mrs. Crotts called the police at 5:00 a.m. to report that someone had tampered with her vehicle. An officer arrived, and Mrs. Crotts reported that she had found some papers taken from her car and thrown on the ground. She also reported that her dogs had been let out of her backyard and that a step on the back porch was out of place. The officer found no suspicious persons in the neighborhood.

Goodwin had already entered Mrs. Crotts's house that morning and hid in the basement until after the police left. ([Goodwin] . . . opened the backyard gate, entered Mrs. Crotts's house through an unlocked back door, sat on a chair in the basement and smoked a cigarette. Several hours passed. Eventually, [Goodwin], carrying a hammer, climbed the basement stairs and confronted Mrs. Crotts in her kitchen. (43 S.W.3d at 810-11.) He grabbed her arm and forced her into the living room where he forced Mrs. Crotts to perform oral sex on him. He then took her back to the kitchen. While drinking a two-liter bottle of Pepsi, he wrote on a piece of paper "you are next," and forced her to walk to the head of the basement stairs. With both hands, he shoved her down the stairs. As she lay face down and unmoving at the bottom of the stairs, Goodwin watched her for a while. Then he hit the back of her head several times with the sledgehammer and left

the house.

Mrs. Crotts's daughter found her, still alive, that afternoon, and Mrs. Crotts related these events to a police officer at the hospital. Mrs. Crotts died that evening (following emergency surgery). An autopsy revealed that Goodwin inflicted injuries all over her body. In addition to the skull fractures, which caused her death, she had bruises and injuries on her face, chest, shoulders, back, buttocks, knees, thighs, and both arms and hands. She had eight broken ribs and a broken hip. Many of the wounds were defensive wounds. Many of the injuries were not consistent with a fall down the stairs, but instead of a beating.

The police found the note and Pepsi bottle. Goodwin's fingerprints were on both. They also found bootprints in the spilled Pepsi. Two cigarette butts and a wrapper, the brand Goodwin smoked, were found in the basement. Just outside the door, police found Goodwin's hearing aid. After obtaining a warrant to search Goodwin's home, the police found blood stains on a pair of his jeans, underpants, and boots. The boots matched the bootprints left in the spilled Pepsi.

The police picked Goodwin up at work that day. After being offered a sign-language interpreter and being advised of his Miranda rights, Goodwin admitted to killing Mrs. Crotts and provided the details above. (In his oral statement to the police, [Goodwin] admit(ed) to being at Mrs. Crotts's home. [Goodwin] said that he had spent the evening drinking heavily at a bar . . . . Between 11:00 p.m. and midnight, he got a ride with a co-worker who dropped him off at a . . . gas station. [Goodwin] began walking and eventually arrived at Mrs. Crotts's backyard, opening the gate and entering the basement as detailed above. Following the completion of his statement, [Goodwin] accompanied police to the victim's house and re-enacted the events of the morning of March 1. 43 S.W.3d at 811.

At trial, the defense relied primarily on the theory that [Goodwin] suffered from a mental disease or defect preventing him from acting with deliberation or being responsible for his conduct. Id.

## Procedural Background

Petitioner is currently incarcerated at the Potosi Correctional Center in Potosi, Missouri. He was convicted of murder in the first degree following a jury trial in the Circuit Court of the County of St. Louis. Petitioner did not testify at the trial. The jury returned a verdict of guilty and recommended the death penalty. On December 2, 1999, the trial court sentenced petitioner to death in accordance with the jury's recommendation.

Petitioner appealed his conviction and sentence, raising the following issues before the Missouri Supreme Court (which has exclusive jurisdiction in capital cases)—(1) the prosecution failed to disclose material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (regarding the interview of Ron Krabbenhoft about the sledgehammer incident); (2) the prosecution improperly cross-examined defense expert Dr. Rosalyn Schulz about racist remarks petitioner made during an interview; (3) the transcript of petitioner's oral statement to the police included a reference to a prior unsolved murder; (4) the evidence was insufficient to show that petitioner knowingly caused the victim's death; (5) the prosecution improperly cross-examined Dr. Schulz about petitioner's prior bad acts; (6) the victim's statement to the police was improperly admitted; (7) the evidence was insufficient to establish two statutory aggravating circumstances; (8)

one of the statutory aggravating circumstances was not valid; (9) the death

sentence was imposed under the influence of passion, prejudice and racism; and

(10) the death sentence was disproportionate and excessive in light of petitioner's

low IQ and learning disabilities.

The state Supreme Court rejected petitioner's claim that the prosecution

failed to disclose to the defense the statement of Ron Krabbenhoft in violation of

*Brady v. Maryland*.  43 S.W.3d at 812-13.  Petitioner argued that Krabbenhoft told

a state investigator that petitioner "played" with a sledgehammer, hitting only the

ground, and denied that petitioner had made any threats toward the victim on that

occasion or that the victim was even present.  Petitioner argued that Krabbenhoft's

statements could have been used to impeach James Hall's testimony that petitioner

hit a rock with the sledgehammer and threatened the victim by saying "This is your

head if you keep messing with me."

As the state Supreme Court explained,

[the defense] theory of the case was [petitioner] suffered from a
mental disease or defect and was unable to form the requisite intent.
[Petitioner] conceded that he entered [the victim's] house and
eventually beat her in the head with a hammer.  In [petitioner's]
statement to the police, he maintained that he had only seen [the
victim] one time while living at the boardinghouse.  He stated that he
did not recognize her, apparently on the day he entered her house, and
never paid much, if any, attention to her.

[Petitioner] also called a psychologist who testified that [petitioner]

told her, consistent with his statement to the police, that he originally thought [the victim's] house was the boardinghouse and that he had only seen the victim once in the past. Together, he asserts that the statement and the testimony suggest a lack of malice and deliberation because he was unsure of where he was going and did not have a previous on-going conflict with his former neighbor. [Petitioner argued that] Krabbenhoft's testimony would have supported this position and served to impeach Hall's testimony.

Id. at 812-13.

The Missouri Supreme Court found no *Brady* violation. First, the Court noted that Krabbenhoft's statement did not impeach Hall's testimony. *Id.* at 813. It was questionable whether Krabbenhoft and Hall were speaking of the same incident; Krabbenhoft owned the sledgehammer and kept it in the yard of the boardinghouse where the residents of the boardinghouse occasionally played with it; Krabbenhoft told the police that he was afraid of petitioner because of petitioner's temper and propensity for violence when he drank alcohol and that petitioner disliked and harassed the victim. For these reasons, the Court concluded that Krabbenhoft's statement, "as a whole, does not undermine Hall's testimony about what appears to have been a separate occasion," *id.*, and "contradicts [petitioner's] claim to have only seen [the victim] on one day and that he was not sufficiently familiar with the area to be able to distinguish the victim's house from the boardinghouse." *Id.*

Petitioner next argued that in cross-examining Dr. Schulz, the prosecution

improperly elicited irrelevant and inflammatory racist remarks petitioner made during an interview. Petitioner is white; the jury included four African-Americans. The state Supreme Court found that since the defense did not object at trial, petitioner failed to preserve this issue for appellate review. The issue was therefore reviewed under the plain error standard. The Court agreed that "the bad character of an accused is unsuitable for inquiry unless he injects the issue of character into the case," and also agreed that "evidence that an accused holds racist views casts him in an unsavory light." *Id.* at 814. The state Supreme Court noted that "the prosecutor's question was probative of a potential alternative cause for [petitioner's] low [IQ] scores." *Id.* Petitioner "injected the issue of his low intelligence as reflected by his past test scores." *Id.* The prosecutor then inquired about the possibility that "[petitioner's] unhappiness at a predominantly African-American school caused his poor test performance rather than low intelligence." *Id.* at 815. The Court found no plain error. *Id.*

He then argued that the transcript of his oral statement to the police improperly suggested his involvement in another homicide. At trial, the prosecution played the tape recording of petitioner's oral statement to the jury and produced a written transcript to enable the jury to follow the tape recording. The state supreme court reviewed the transcript and concluded that the "questions, . . .

'sounds similar to this?  Do you remember something like that a few years ago?' cannot be taken for more than a vague reference" and were not "clear evidence linking a defendant to other crimes."  *Id.*  They noted that the "questions [came] right after a thorough inquiry into [petitioner's] attire when committing the crime [at issue] and [did] not implicate any specific incident or act."  *Id.*

For his fourth point, petitioner argued that the evidence was insufficient to show that he knowingly caused the victim's death.  Petitioner claimed that he was confused and unable to deliberate due to his intoxication and the loss of his hearing aid.  The state high court found that the evidence was sufficient to establish that petitioner acted knowingly, that is, petitioner "knew his attack on Mrs. Crotts was practically certain to cause her death."  *Id.* at 816.  The Court summarized the trial evidence on this point as follows:

> In the instant case, [petitioner] pushed a sixty-two year old woman down the stairs to the concrete floor below.  He followed and watched her for some time.  Then, he took a hammer and struck the woman's head three times, fracturing her skull.  Intent to kill or inflict serious bodily injury can be inferred from the use of a deadly weapon on some vital area of the victim's body.  Certainly, striking another in the head with a hammer multiple times demonstrates intent to kill or inflict serious injury.

*Id.* (citation omitted).

Petitioner also argued the prosecution improperly cross-examined Dr. Schulz about her knowledge of petitioner's prior bad acts and criminal charges.  As to this

argument, the Court observed that Dr. Schulz's report indicated that "her conclusion about [petitioner's] faculties at the time of the crime were supported by the fact that he had 'no history of significant criminality or violence.'" *Id.* at 817. The prosecutor asked Dr. Schulz what she considered "significant" and whether petitioner had informed her of several past incidents involving assaults. The Court concluded that the prosecution was "entitled to test the depth of the [expert's] knowledge about that history." *Id.*

In his sixth point, petitioner urged that the testimony of the police officer who interviewed the victim in the hospital following the attack was hearsay and inadmissible as a dying declaration. Since this issue had not been preserved for appellate review, the Court reviewed it for plain error. *Id.* at 818. Under this analysis, the Court noted that the police officer's testimony about the victim's statement was similar to petitioner's oral statement to the police, which had been admitted into evidence, and that "[a]n allegedly wrongful admission of hearsay testimony does not constitute plain error if such testimony is merely cumulative to other evidence properly admitted." *Id.*

Petitioner then argued, to no avail, that the evidence was insufficient to support two of three statutory aggravating circumstances found by the jury (that the murder was committed while petitioner was engaged in attempted forcible sodomy

and that petitioner killed the victim while she was helpless) (issue 7). "The test for challenging the sufficiency of the evidence to support an aggravating circumstance is whether a reasonable juror could find from the evidence that the proposition advanced is true beyond a reasonable doubt." *Id.* The Court reviewed the evidence under this test and concluded that a reasonable juror could have found both challenged aggravating circumstances proven beyond a reasonable doubt. *Id.*

Another argument put forth by petitioner in the Missouri Supreme Court was that one of the statutory aggravating circumstances did not comply with the applicable state-approved instruction (Missouri Approved Instructions or MAI). The Court again noted that this issue had not been preserved for appellate review, but would therefore be reviewed for plain error. *Id.* at 819. The Court considered and rejected the alleged errors in the wording and numbering of the parts of the instruction, noting that the challenged instruction may have required the prosecution to take on a greater burden in order to have the jury recommend the death penalty. *Id.* (interpreting the instruction as requiring the prosecution to prove all three aggravators instead of just one). The Court observed that the jury found two independent statutory aggravators (burglary and attempted forcible sodomy) and concluded that, "[e]ven if the instruction was in error because the aggravating circumstances were improperly conjoined, reversal would not be necessary as a

death sentence will be affirmed if even one valid statutory aggravating circumstance is found." *Id.*

Finally, the state Supreme Court, in affirming the conviction and death sentence, concluded that the death sentence had not been imposed under the influence of passion, prejudice or any other arbitrary factor (issue 9). They concluded the death sentence was not excessive and disproportionate, even considering petitioner's low intelligence, relatively insignificant criminal record, hearing disability, difficulties in his personal life, and intoxication at the time of the murder, since no expert diagnosed petitoner as mentally retarded. *State v. Goodwin*, 43 S.W.3d 805. The United States Supreme Court denied certiorari on October 1, 2001. *Goodwin v. Missouri*, 534 U.S. 903 (2001) (mem.).

At the time of trial in 1999, the Missouri death penalty statute did not prohibit the execution of the mentally retarded. The state legislature added that prohibition in 2001 and made it applicable to homicides committed after August 28, 2001. The statutory prohibition thus did not apply to petitioner (the offense of conviction was committed in 1998). In June 2002, the United States Supreme Court decided *Atkins v. Virginia*, 536 U.S. 304 (2002) (the opinion was filed on June 20, 2002), holding that the eighth amendment prohibits the execution of mentally retarded persons.

## Post-conviction Relief

On August 27, 2001, petitioner filed a Rule 29.15 motion, pro se, for post-conviction relief pursuant to Mo. S. Ct. R. 29.15. Appointed counsel for petitioner filed an amended motion and requested an evidentiary hearing.

Petitioner raised the following issues in his amended motion: (1) trial counsel failed to adequately investigate and provide defense experts with a complete and accurate social history, (2) trial counsel failed to retain an expert on mental retardation, (3) the execution of the mentally retarded is unconstitutional, (4) trial counsel failed to adequately investigate and present medical evidence about the victim's injuries and cause of death, (5) trial counsel failed to adequately investigate and present evidence about petitioner's motive, (6) trial counsel failed to adequately investigate and present evidence to rebut the prosecution's theory about petitioner's motive, (7) trial counsel failed to adequately investigate and present evidence about the sledgehammer incident, (8) trial counsel failed to adequately investigate and present evidence that petitioner was incapable of planning and deliberation, (9) trial counsel failed to adequately investigate and present evidence that petitioner was confused when he entered the victim's house, (10) trial counsel failed to present evidence that petitioner walked up and

down Hanley Road for a legitimate reason, (11) trial counsel failed to adequately investigate and adequately prepare for the penalty phase hearing, (12) trial counsel failed to object to the prosecution's voir dire, (13) trial counsel failed to object to the victim impact statements, and (14) the lethal injection method of execution is unconstitutional.

The motion court held an evidentiary hearing limited to whether petitioner was mentally retarded and whether trial counsel was ineffective with respect to that claim (issues 2 and 3). The motion court denied post-conviction relief in an extensive memorandum decision.

Petitioner appealed the denial of post-conviction relief and raised the following issues—(1) a new penalty phase hearing is required because there is evidence he is mentally retarded, (2) trial counsel failed to adequately investigate and present evidence of mental retardation, (3) trial counsel failed to adequately investigate and present evidence about petitioner's lack of a motive, (4) trial counsel failed to adequately investigate and present evidence that petitioner did not threaten the victim while smashing a rock with a sledgehammer, (5) trial counsel failed to adequately investigate and present medical evidence about the victim's injuries and cause of death, (6)

trial counsel failed to adequately investigate and present evidence that

petitioner lacked the mental capacity to plan and deliberate, (7) trial counsel

presented inconsistent theories in the guilt and penalty phases, (8) the lethal

injection method of execution is unconstitutional, and (9) the prosecutor

made improper comments in closing arguments during the penalty phase.

The Missouri Supreme Court affirmed the denial of post-conviction

relief. *Goodwin v. State*, 191 S.W.3d 20. The motion for rehearing was

denied on May 17, 2006, and the mandate was issued on May 30, 2006.

As noted above, the motion court limited the evidentiary hearing to

whether petitioner is mentally retarded and whether trial counsel should

have retained an expert on mental retardation. Petitioner first argued that he

was denied due process, a jury trial, effective assistance of counsel, and

freedom from cruel and unusual punishment because he is mentally retarded.

The state Supreme Court noted that whether petitioner is retarded was the

"major issue" in the post-conviction relief proceeding, citing to *Atkins*. *Id.* at

26.

The Court decided that petitioner "was not entitled to an evidentiary

hearing on this issue because his claim of mental retardation is conclusively

refuted by the record of the trial." *Id.* The trial record included the

testimony of three defense experts-- two psychologists, Dr. Rosalyn Schultz and Dr. Richard Wetzel, and a psychiatrist, Dr. John Rabun. None of the experts testified that petitioner was mentally retarded. *Id.* at 27. The state supreme court observed that the experts agreed that petitioner was severely depressed, suffered from personality disorders, and was of borderline intelligence, but none of the experts testified that petitioner was mentally retarded. *Id.* at 28.

With respect to the selection of experts, the Missouri Supreme Court agreed with the motion court that trial counsel adequately investigated the issue of mental retardation. *Id.* at 29-30 & n.6 (the motion court found that "trial counsel had no reason to dispute the findings of experts who were consulted prior to trial as well as the litany of prior experts who evaluated [petitioner] during his lifetime"). The state Supreme Court viewed this claim as challenging trial counsel's selection of expert witnesses, which it characterized as a "question of trial strategy and virtually unchallengeable." The Court concluded trial counsel was not ineffective for failing to "shop for an expert witness who might provide more favorable testimony." *Id.* n.7 (citations omitted) (noting that the motion court found that trial counsel cannot be "considered ineffective for not seeking out a third psychologist

when the first two consulted agreed that [petitioner] suffered from depression, not mental retardation").

Furthermore, the Court agreed with the motion court that petitioner did not prove that he is mental retarded, as defined by state law, by a preponderance of the evidence. *Id.* (citing Rev. Stat. Mo. § 565.030.6 (2000)). The state statute defines "mental retardation" as:

> A condition involving substantial limitations in general functioning characterized by significantly subaverage intellectual functioning with continual extensive related deficits and limitations in two or more adaptive behaviors such as communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work, which conditions are manifested and documented before eighteen years of age.

"Significantly subaverage intellectual functioning is defined as an IQ of about 70 or below (approximately 2 standard deviations below the mean)." American Psychiatric Association, Diagnostic and Statistical Manual IV (DSM-IV) at 41 (2000) (on standardized intelligence tests).

The Missouri Supreme Court reviewed and summarized the evidence of petitioner's "eight independent intelligence tests spread over twenty years that indicated that [petitioner] is not retarded," 191 S.W.3d at 30 & n.7 (noting that only one of these tests was even arguably within a five-point margin of error attributed to the Wechsler scale), and concluded that

- 16 -

petitioner "cannot make the initial showing of 'significantly subaverage intellectual functioning' as demonstrated by his IQ, which places him consistently in the mid-seventies to eighties. He is squarely of borderline intelligence as testified all of the experts at trial." *Id.* at 31.

The Court next considered evidence of petitioner's adaptive functioning, the second factor required to prove mental retardation. The DSM-IV defines adaptive functioning as follows:

> Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting. Adaptive functioning may be influenced by various factors, including education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation.

DSM-IV at 42. The Court concluded that "it is clear from the record that [petitioner]'s inability to hear has affected his adaptation into society, but this is not enough to overcome the evidence that [petitioner]'s IQ places him of borderline intellectual functioning." 191 S.W.3d at 31 (Dr. Rabun testified that the DSM-IV characterizes borderline IQ as between 71 and 86; petitioner's tests showed full IQ scores between 72 and 84).

The state statute also requires that a defendant establish mental retardation

that is "manifested and documented before eighteen years of age." Rev. Mo. Stat. § 565.030.6. This statutory definition of mental retardation is taken "nearly verbatim" from the DSM-IV. 191 S.W.3d at 30 (citing DSM-IV at 41). Manifestation in infancy, childhood or adolescence is a diagnostic feature of mental retardation. Id. at 32 (citing DSM-IV at 49) (onset before age 18). The state Supreme Court agreed with the motion court that petitioner "presented no documented evidence of retardation prior to age 18." *Id.*

At the evidentiary hearing in the motion court, Dr. Dennis Keyes testified that petitioner is retarded. Dr. Keyes is a prominent educational psychologist, whose research specialty is the mentally retarded and the death penalty. The motion court and the Missouri Supreme Court discounted Dr. Keyes's opinion because he examined petitioner at age 34 (in connection with the motion for post-conviction relief). *Id.* Dr. Keyes interviewed petitioner and his family and friends, and reviewed litigation materials chosen and provided by counsel. *Id.* (noting that the motion court had listened to petitioner's taped statement and disagreed with Dr. Keyes's conclusion that petitioner communicated at the level of a 3-year-old. Moreover, Dr. Keyes admitted that many of the claims made by petitioner during his interview were "distorted, exaggerated, inconsistent and possibly untrue" and that petitioner, his family and friends have "a strong incentive not to speak honestly

about his past"). They recognized that Dr. Keyes's testimony was "wholly inconsistent" with the trial experts and that his conclusions were "unsupported by the independent records submitted or any credible evidence adduced." *Id.* (including records from special school district attended by petitioner). More importantly, the Court noted that the motion court did not consider Dr. Keyes as an expert witness because Dr. Keyes was not certified or licensed as a psychologist or psychiatrist and had not been trained to evaluate the IQ of hearing-impaired individuals, which the motion court concluded undermined the reliability of his testing results. *Id.* at 33.

Goodwin argued that the motion court clearly erred in failing to hold an evidentiary hearing on the claim that trial counsel failed to adequately investigate and present evidence to rebut the state's evidence of motive (suggestion that he blamed the victim for his eviction from the boardinghouse). Petitioner argued that documentary evidence (for example, cancelled checks) and several witnesses would have established that he was not evicted from the boardinghouse in August 1996 and lived there until November 1996. The motion court concluded the proffered testimony would not have been admissible because it was based upon hearsay, speculation and opinion, and would not have provided a viable defense. *Id.* at 34 (citing decision of motion court). The Supreme Court of Missouri observed that the

proffered testimony showed only that the victim did not complain to the landlord of the boardinghouse and that petitioner was evicted in November (months later). *Id.* This proffered evidence did not contradict the state's theory about petitioner's possible motive (that petitioner held a grudge against the victim based upon their confrontations during the time he lived at the boardinghouse). *Id.*

Petitioner also asserted that the motion court erred in failing to hold an evidentiary hearing on his claim that trial counsel failed to adequately investigate and present evidence in order to rebut the state's evidence that petitioner had threatened the victim while smashing a rock with a sledgehammer. The motion court rejected this claim, noting that Krabbenhoft was not a credible witness and that his testimony would have been inconsistent with the testimony of several other witnesses, would not have impeached Hall, and would have been cumulative. Id. at 35. Missouri's Supreme Court agreed with the motion court that this claim had been raised as part of the direct appeal and could not be relitigated during a post-conviction proceeding, even on a different legal theory (ineffective assistance counsel). Id. at 36 (state citation omitted).

Petitioner urged that the motion court erred in failing to hold an evidentiary hearing on his claim that trial counsel failed to adequately investigate and present medical evidence (Dr. Thomas Bennett, a forensic pathologist). He argued that the

pathology reports and physical evidence showed that the victim's injuries were consistent with a fall down the basement stairs and not repeated and excessive physical abuse, which was a necessary finding for the aggravating circumstance of depravity of mind, and to rebut the state's evidence of deliberation. On review the state's Supreme Court agreed with the motion court that "Dr. Bennett's testimony would not have refuted the jury finding that [petitioner] killed [the victim] by beating her, shoving her down the stairs, and striking her head with a sledgehammer." *Id.* at 36. Dr. Bennett's testimony "would only have reapportioned the amounts of damage done by each of [petitioner's] actions and confirmed that [the victim] had some contributing health problems." *Id.* at 37. The Court further agreed that Dr. Bennett's testimony "only reapportions the actual cause of death from the beating to the shoving (down the stairs). This does not undercut the State's theory of deliberation or depravity." *Id.*

Petitioner asserted that the motion court committed error in failing to hold an evidentiary hearing on the claim that trial counsel failed to adequately investigate and present evidence that he lacked the capacity to plan and deliberate. He argued that several witnesses would have testified that he was not capable of detailed planning due to his intellectual deficits, that he was easily confused, and that he had legitimate reasons for walking along a major street near the victim's house. In

considering this argument the Missouri Court characterized this as a claim that trial

counsel should have presented more evidence to show that petitioner lacked the

capacity to plan and deliberate. *Id.* The Court agreed with the motion court that the

proposed witnesses could not have testified about what petitioner was thinking at

the time of the crime. Furthermore, Dr. Schultz testified extensively about

petitioner's mental capacity and mental condition. *Id.* at 38. The Missouri Supreme

Court concluded that the proposed testimony would have been cumulative. Trial

counsel, therefore was not ineffective for "not putting on cumulative evidence." *Id.*

(citation omitted). Another of petitioner's arguments was that the motion court

erred in failing to hold an evidentiary hearing on his claim that trial counsel failed

to adequately investigate and present evidence about his background. The motion

court held the failure-to-investigate background claim was refuted by the record.

*Id.* at 39 (citing decision of the motion court). Dr. Schultz and Dr. Wetzel

thoroughly investigated petitioner's social history, interviewed many witnesses, and

reviewed voluminous records. *Id.* at 39-40.

Goodwin posited the argument that the motion court clearly erred in failing to

hold an evidentiary hearing on his claim that trial counsel presented inconsistent

theories in the guilt and penalty phases. The Supreme Court of Missouri did not

agree that the expert testimony in the two phases was inconsistent. Rather, the

Court characterized trial counsel's approach during the penalty phase as "simply a retooling" of the defense in the guilt phase. *Id.* at 39. At trial during the guilt phase, the theory of defense was mental disease or defect; Dr. Schultz testified in the guilt phase that petitioner was "not able to coolly reflect or deliberate." Id. During the penalty phase, Dr. Wetzel testified that, "although [petitioner] could control his behavior, his ability to conform his conduct to the law was substantially impaired, which should be considered as a mitigating factor." *Id.* The Court held that

> the jury had just rejected [petitioner's] argument that he was not responsible for the murder because of his mental state. It was not error for counsel to then argue that, even though the jury found that his mental state was not sufficient to excuse him, it should still consider his mental state to mitigate his punishment.

*Id.* at 39-40 (state citation omitted).

Petitioner's argument that the motion court clearly erred in failing to hold an evidentiary hearing on his claim that lethal injection as a method of execution is unconstitutional has recently been rejected by the United States Supreme Court in *Baze v. Rees*, 128 S. Ct. 1520 (2008) (rejecting attack on three-drug lethal injection protocol method of execution).

Since petitioner did not raise his claim in his direct appeal or in the motion court, that he was denied a fair trial because the prosecutor made improper

comments during closing argument in the penalty phase, the Missouri Supreme Court denied relief. *Id.* at 41 (citing state law).

Finally, the Missouri Supreme Court concluded that "there is no reasonable probability that had every single thing [petitioner] complains about been otherwise, 'the result of the proceeding would have been different.'" *Id.*

The motion for rehearing was denied on May 30, 2006. The United States Supreme Court denied the petition for writ of certiorari on February 20, 2007. *Goodwin v. Missouri*, 549 U.S. 1214 (2007) (mem.).

State Habeas Petition (Rule 91)

On May 23, 2007, petitioner filed a state habeas corpus petition pursuant to Mo. S. Ct. R. 91. Petitioner claimed that he is a prisoner sentenced to death before *Atkins* was decided and that the state (1) unconstitutionally denied him a jury trial on the issue of mental retardation and (2) unconstitutionally placed on him the burden of proof on the issue of mental retardation by a preponderance of the evidence in the post-conviction relief proceeding. The state Supreme Court denied the Rule 91 petition on October 30, 2007. *In re Goodwin v. Roper*, No. SC88552 (Mo. Oct. 30, 2007).

Appointed counsel filed this habeas petition on November 6, 2007 (Doc. #11). With respect to the guilt phase of the trial, the petition claims that petitioner was denied due process when the state failed to disclose the Krabbenhoft interview (ground A); when the prosecutor elicited racist remarks petitioner made during an interview with Dr. Schulz (ground B); when the prosecutor elicited information from Dr. Schulz about petitioner's other crimes (ground C); and because the transcript of petitioner's oral statement suggested his involvement in another homicide (ground D).  The petition further asserts that petitioner was denied his right to confrontation when the police officer testified about the victim's statement made in the hospital (ground E).  In addition, the petition also claims that petitioner was denied due process because the evidence was insufficient to prove beyond a reasonable doubt that he acted knowingly (ground F).

With respect to the penalty phase of the trial, petitioner claims that he was denied the right to a jury determination on the issue of whether he is mentally retarded (ground G).  In support of this argument, he cites several Supreme Court cases, including *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002), *Atkins v. Virginia*, 536 U.S. 304 (2002), *Blakely v. Washington*,

542 U.S. 296 (2004), and *Cunningham v. California*, 549 U.S. 270 (2007). The petition claims that petitioner presented sufficient evidence at the motion hearing that, if believed by a jury, would have resulted in a finding that he is mentally retarded and that the state unconstitutionally required petitioner to prove mental retardation by a preponderance of the evidence (ground H). It is argued that, even if the motion court is entitled to determine the issue of mental retardation, the motion court clearly erred in finding that petitioner is not mentally retarded (ground I), because clear and convincing evidence showed qualifying low IQ scores, poor adaptive skills and manifestation before age 18, thus meeting the state statutory definition of mental retardation.

Petitioner raises the claims that he was denied due process because the prosecutor made improper closing arguments during the penalty phase (ground J); that the sentence of death is unconstitutional because there was insufficient evidence to prove two statutory aggravating circumstances (ground K); and because the trial court submitted an invalid statutory aggravating circumstance to the jury (ground L). The petition also argues that petitioner's death sentence is unconstitutional because it was likely the result of passion, prejudice or some other arbitrary factor, and is excessive and disproportionate to the sentence imposed in similar cases (ground M).

The following claims of ineffective assistance of trial counsel are presented as

well: failure to adequately investigate and present evidence that he is mentally retarded (ground N), failure to adequately investigate and present evidence to rebut the state's suggestion of motive (ground O), failure to adequately investigate and present evidence to rebut the state's evidence that he smashed a rock with a sledgehammer while threatening the victim (ground P), failure to adequately investigate and present medical evidence about the victim's injuries and cause of death (ground Q), failure to adequately investigate and present evidence that petitioner lacked the capacity to plan and deliberate (ground R), presentation of inconsistent defenses during the guilt and penalty phases (ground S), and failure to object to the prosecutor's improper closing arguments during the penalty phase (ground T).

<u>Standard of Review</u>

The Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(d),  limits the scope of judicial review in a habeas proceeding.

> "[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." In fact, when a claim has been adjudicated on the merits in state court, an application for writ of habeas corpus may only be granted where the state court adjudication:

>> (1) resulted in a decision that was <u>contrary to</u>, or involved an <u>unreasonable application</u> of, clearly established Federal law, as determined by the Supreme

Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1), (2).

*Colvin v. Taylor*, 324 F.3d 583, 586-87 (8th Cir.) (emphasis added, citations omitted), *cert. denied*, 540 U.S. 851 (2003).

Under the "contrary to" clause of 28 U.S.C. § 2254(d)(1), "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "In applying the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Evans v. Rogerson*, 223 F.3d 869, 872 (8th Cir. 2000) (citations omitted). An "unreasonable application" can also occur where "the state court either unreasonably extends a legal principle from [Supreme] Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. at 407. "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas

court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 409. "Rather, that application must also be objectively unreasonable." *Id.* at 411.

In reviewing a state court conviction, a federal habeas court also presumes that a state court's factual determinations are correct; this presumption may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). "The presumption of correctness applies to all factual determinations made by state courts of competent jurisdiction, including trial courts and appellate courts*." Pruett v. Norris*, 153 F.3d 579, 584 (8th Cir. 1998). This Court will review petitioner's claims under these pronounced standards.

<u>Exhaustion and Procedural Default</u>

"Before a state prisoner is entitled to federal habeas corpus relief, he must first exhaust his state remedies and present the habeas claim to the state court." *Abdullah v. Groose*, 75 F.3d 408, 411 (8th Cir.) (banc), *cert. denied*, 517 U.S. 1215 (2006). Under 28 U.S.C. § 2254(c), a petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State, . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." "When reviewing a federal habeas corpus petition, [the Court] usually can only consider

'those claims which the petitioner has presented to the state court in accordance with state procedural rules.'" *Abdullah v. Groose*, 75 F.3d at 411 (citation omitted). "If a prisoner has not presented his habeas claims to the state court, the claims are defaulted if a state procedural rule precludes him from raising the issues now." Id.

To avoid procedural default, a petitioner must have presented his claims at each step of the judicial process in state court. *E.g., Jolly v. Gammon*, 28 F.3d 51, 53 (8th Cir.), *cert. denied*, 513 U.S. 983 (1994). "Failure to raise a claim on appeal from the denial of a post-conviction motion erects a procedural bar to federal habeas review." *Id., citing Gilmore v. Armontrout*, 861 F.2d 1061, 1065 (8th Cir. 1988), *cert. denied*, 490 U.S. 1114 (1989). "A petitioner must present 'both the factual and legal premises' of his claims to the state courts in order to preserve them for federal habeas review," *Flieger v. Delo*, 16 F.3d 878, 884-85 (8th Cir.) (citations omitted), *cert. denied*, 513 U.S. 946 (1994), as well as "the substance of his federal habeas corpus claim." *Abdullah v. Groose*, 75 F.3d at 411, *citing Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam). "In [the Eighth C]ircuit, to satisfy the 'fairly presented' requirement, [a petitioner is] required to 'refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue' in the Missouri state court." *Id.* at 412. "[P]resenting a claim to the state courts that is merely

similar to the federal habeas claim is insufficient to satisfy the fairly presented requirement." *Id.*

"We may reach the merits of a procedurally barred claim only if [the petitioner] can show either cause for the procedural default and prejudice from the alleged violation of federal law, or that there would otherwise be a fundamental miscarriage of justice." *Flieger v. Delo*, 16 F.3d at 885 (citations omitted). Under the "miscarriage of justice" exception to the procedural default doctrine, if a petitioner argues that he is actually innocent and, therefore, a fundamental miscarriage of justice will result if the federal court does not consider the merits of his claim, the claim can be considered. The petitioner must present "new reliable evidence . . . not presented at trial," that is "so forceful that 'it is more likely than not that no reasonable [trier of fact] would have convicted him in light of the new evidence.'" *Johnson v. Norris*, 170 F.3d 816, 818 (8th Cir. 1999) (*citing* <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). Framing the question in terms of petitioner's case, petitioner must prove "it is more likely than not that no reasonable juror would have [found that he is not mentally retarded] before [the Court] may review the merits" of his claim. *Burton v. Dormire*, 295 F.3d 839, 846 (8th Cir. 2002), *cert. denied*, 538 U.S. 1002 (2003).

As noted above, petitioner failed to preserve several issues for appellate

review (issues 2, 6, 8), but the Missouri Supreme Court reviewed those issues for plain error. There is a decisional split in the Eighth Circuit on "whether plain-error review by a state appellate court waives a procedural default by a habeas petitioner, allowing collateral review." *Hornbuckle v. Groose*, 106 F.3d 253, 257 (8th Cir. 1997), *citing Mack v. Caspari*, 92 F.3d 637, 641 n.6 (8th Cir. 1996), *cert. denied*, 520 U.S. 1109 (1997); *see Thomas v. Bowersox*, 208 F.3d 699, 701 (8th Cir.) (reaching merits of habeas claim where state court had reviewed for plain error), *cert. denied*, 531 U.S. 967 (2000). In *Warren v. Kemna*, No. 4:00CV882 HEA, slip op. at 15 (E.D. Mo. May 9, 2003), this Court did not have to decide the plain error waiver question because the habeas petitioner's habeas claims were without substantive merit.

Motion to Dismiss

As a preliminary matter, the state has filed a motion to dismiss the federal habeas petition as untimely filed. (Doc. #20, part I) The state argues AEDPA's one-year statute of limitations began to run on May 31, 2006, the day after the state Supreme Court issued its mandate, thus giving petitioner until May 31, 2007, to file his federal habeas petition; petitioner did not file his federal habeas petition until November 6, 2007, more than five months later. Petitioner argues that his federal habeas petition was timely filed because the running of the AEDPA statute of

limitations was subject to statutory tolling during the more than five months his Rule 91 state habeas petition was pending in state court (from May 23 to October 30, 2007).

The state does not dispute that the Rule 91 state habeas petition was "properly filed" within the meaning of 28 U.S.C. § 2244(d)(2). However, the state argue that the Rule 91 state habeas petition does not qualify as "State post-conviction or other collateral review" within the meaning of AEDPA. The state also asserts that statutory tolling for "extraordinary" relief, like Rule 91 state habeas petitions, is contrary to AEDPA and its fundamental goal of finality for state convictions and sentences. Furthermore, Rule 91 state habeas petitions are not part of the state's "ordinary" post-conviction relief process and are not required to exhaust available state remedies. The state also argues petitioner already raised both of the claims in his Rule 91 state habeas petition in his post-conviction appellate brief, making his Rule 91 state habeas petition in effect an improper successive motion under state law. Lastly they assert, as a policy matter, federal habeas courts should discourage such clearly dilatory tactics by state capital prisoners who seek to extend statutory tolling through the filing of extraordinary writs.

In the traverse, petitioner argues that, contrary to the state's argument, the Rule 91 state habeas petition is "other collateral review" for purposes of

§ 2244(d)(2), which was "properly filed" for purposes of AEDPA, and thus tolls the

running of the one-year statutory period. *Duncan v. Walker*, 533 U.S. 167, 177

(2001) (noting "Congress may have refrained from exclusive reliance on the term

'post-conviction relief' so as to leave no doubt that the tolling provision applies to

all types of state collateral review available after a conviction and not just to those

denominated 'post-conviction relief' in the parlance of a particular jurisdiction"),

*Bishop v. Dormire*, 526 F.3d 382, 384 (8th Cir. 2008), *and Snow v. Ault*, 238 v.

1033, 1035 (8th Cir. 2001); *see Pratt v. Greiner*, 306 F.3d 1190, 1195-96 (2d Cir.

2002) (holding petitioner's state court motion to vacate conviction based on

fraudulent police report was nonetheless "properly filed"); *Storey v. Roper*, 2007

WL 957313, at *4 (E.D. Mo. Mar. 27, 2007) (order denying motion to dismiss)

(holding Mo. S. Ct. R. 91 motions and motion to recall mandate are "other collateral

review" for purposes of 28 U.S.C. § 2244(d)(2) that can toll the limitations period

even after a petitioner has gone through the normal post-conviction relief process).

"Before 1996, there was no statute of limitations on requests for federal

habeas relief." *Riddle v. Kemna*, 523 F.3d 850, 852 (8th Cir. 2008) (banc). For

federal habeas petitions filed after April 24, 1996 (the effective date of AEDPA),

such as the instant petition, "an inmate must file for federal habeas relief within one

year of the date when a judgment becomes final by the 'conclusion of direct review'

or 'the expiration of the time for seeking such review.'" *Bishop v. Dormire*, 526 F.3d at 383 (28 U.S.C. § 2244(d)(1)(A)). "The one-year limitation is tolled for '[t]he time during which a properly filed application for State post-conviction relief or other collateral review with respect to the pertinent judgment or claim is pending." (citing 28 U.S.C. § 2244(d)(2)). The Court therefore concludes that the Rule 91 state habeas petition is "a properly filed application for State post-conviction relief or other collateral review."

<u>Request for Evidentiary Hearing</u>

On May 5, 2008, petitioner filed a request for an evidentiary hearing (doc. #19) in order to introduce evidence in support of his *Atkins* mental retardation claim and the related ineffective assistance of counsel claim. Petitioner noted that the United States Supreme Court did not decide *Atkins* (on June 22, 2002) until after his post-conviction motion was filed on December 10, 2001. On March 7, 2002, petitioner filed a motion for continuance in the Missouri Supreme Court pending the United States Supreme Court's anticipated decision in *Atkins*; no ruling was made on the motion. As noted above, the motion court held a limited evidentiary hearing on October 1, 2003 on the mental retardation claim and related ineffective assistance of counsel claim, but not on the other ineffective assistance of counsel claims. Petitioner argues that state law does not permit amendment of or filing

successive Rule 29.15 motions outside of the statute of limitations.

Petitioner urges that AEDPA's more restrictive standard should not apply because, under the circumstances, he did not fail to develop the factual basis of the *Atkins* claim in the state court proceeding. See 28 U.S.C. § 2254(e)(2). He argues that "[s]ince *Atkins* created a previously unavailable claim based on the unconstitutionality of executing the mentally retarded, [petitioner] can hardly be said to have lacked diligence in developing the factual basis of that claim in state court." *citing Simpson v. Norris*, 490 F.3d 1029, 1035 (8th Cir. 2007), and *Jackson v. Norris*, 256 Fed. Appx. 12 (8th Cir. 2007).

Even if AEDPA does apply, petitioner believes he is entitled to an evidentiary hearing in federal court. 28 U.S.C. § 2254(e)(2)(I). He claims that he has shown due diligence because he unsuccessfully sought an evidentiary hearing in the motion court. Petitioner also argues that he was not afforded a full and fair hearing in the state motion court and that he alleged specific facts on the issue of mental retardation, which, if true, would entitle him to relief. *Townsend v. Sain*, 362 U.S. 293, 313 (1963).

Similarly, petitioner claims that he is entitled to an evidentiary hearing in this Court on his non-*Atkins*-related ineffective assistance of counsel claims because he diligently pursued these claims in state (motion) court; he was not afforded a full

and fair hearing on these claims in the state (motion) court; and he alleged specific facts which, if true, would entitle him to relief.

The state has opposed the request for an evidentiary hearing arguing that petitioner raised the *Atkins* claim in his post-conviction relief motion; the motion court held an evidentiary hearing on the *Atkins* claim; and the motion court and the state supreme court considered and denied the *Atkins* claim. According to the state, petitioner thus had a full and fair opportunity to litigate his *Atkins* claim in state court and that he now seeks to present <u>new</u> evidence of mental retardation (which he failed to present in the trial court, but was able to present in the motion court). *Id.* at 80. The state argues that petitioner has failed to allege facts, which, if proved, would entitle him to relief on either his *Atkins* claim (ground I) (specifically, that his IQ scores are within the range for borderline intelligence and not mental retardation) or his ineffective assistance of counsel claims (grounds N-S). *Id.* at 81 (the state agrees with petitioner that because the state court did not hold an evidentiary hearing on the non-*Atkins*-related ineffective assistance of counsel claims, the applicable standard is pre-AEDPA, that is, *Townsend v. Sain*).

Petitioner did raise *Atkins* in the Rule 91 state habeas petition. Under state law, claims which could not have been raised in a Rule 29.15 post-conviction motion can be raised in a Rule 91 state habeas petition. *E.g., State ex rel. Simmons*

*v. White*, 866 S.W.2d 443, 446 (Mo. 1993) (banc) (noting under state law that state habeas corpus may be used to challenge a final judgment, after an individual's failure to pursue appellate and post-conviction remedies, only to raise jurisdictional issues or "in circumstances so rare and exceptional that a manifest injustice results"). The motion court held an evidentiary hearing limited to the claims whether petitioner is mentally retarded and whether trial counsel should have retained Dr. Keyes or a similarly qualified expert on mental retardation (the motion court referred to this as claim 9(B)). Habeas counsel maintains that "the issue of whether *Atkins* precluded [petitioner's] death sentence was not before the court and therefore not part of that hearing." The Court construes that argument to mean that *Atkins* was not an issue in the <u>trial</u> court.

According to petitioner, even if AEDPA applies, this Court should hold an evidentiary hearing. He argues that even though petitioner failed to develop the factual basis for his *Atkins* claim in the trial court, *Atkins* is a new rule of constitutional law, made retroactive to cases on collateral review by the United States Supreme Court, and the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable fact-finder would have found the petitioner was not mentally retarded and thus eligible for the death penalty.

Petitioner asserts he is also entitled to an evidentiary hearing on the ineffective assistance of counsel claims unrelated to *Atkins*. These are claims that trial counsel failed to adequately investigate certain issues in the guilt and penalty phases (other than failing to retain an expert on mental retardation like Dr. Keyes), such as failing to adequately investigate and present evidence about petitioner's motive (ground O), the sledgehammer incident (ground P), medical evidence (ground Q), and evidence about petitioner's background and capacity to plan and deliberate (ground R). Habeas counsel notes that petitioner raised the ineffective assistance of counsel claims in state court, investigated the facts, made reasonable efforts to obtain evidence relevant to his claims, and persistently, albeit unsuccessfully, sought an evidentiary hearing in state court. *Id.* at 6. Habeas counsel argues that, under the pre-AEDPA, *Townsend v. Sain* standard, petitioner is entitled to an evidentiary hearing because he has alleged sufficient grounds for habeas relief, the relevant facts are in dispute, and the state court did not hold a full and fair evidentiary hearing. *Id.* at 6-7, *citing Houston v. Lockhart*, 982 F.2d 1246, 1250 (8th Cir. 1993).

In opposition, the state makes the following arguments: petitioner raised what was essentially an *Atkins* claim in his amended post-conviction relief motion. (petitioner argued that he is mentally retarded and that the eighth amendment

prohibited the execution of mentally retarded persons, noting that *Atkins* was pending in the Supreme Court). The motion court conducted an "extensive evidentiary hearing" on the question whether petitioner is mentally retarded (in which Dr. Keyes testified). Petitioner had a full and fair opportunity to litigate his *Atkins* claim in the motion court. The state urges that petitioner is now seeking to present <u>new</u> evidence of mental retardation that was not presented in the motion court. Furthermore, the state claims that petitioner has not shown, by clear and convincing evidence, that he is mentally retarded; in particular, the state notes that petitioner's IQ scores are all above the range of mental retardation.

Finally, the state agrees with petitioner that, with respect to the ineffective assistance of counsel claims unrelated to *Atkins*, the applicable standard is the pre-AEDPA *Townsend v. Sain* standard because there was no evidentiary hearing on these claims in state court. However, the state argues that an evidentiary hearing is not required in federal court because the existing record shows that petitioner was not the recipient of ineffective assistance of counsel.

Petitioner's claim that he is entitled to a hearing under Section 2254(e)(2) is without merit. Section 2254(e)(2) provides:

If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

(A) the claim relies on--

(I) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2254(e)(2).

While petitioner makes the argument that his *Atkins* claim was not raised in the trial court or on direct appeal and it is a new rule of constitutional law made retroactive on collateral review, in addition to establishing by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found him guilty of the underlying offense, thereby entitling him to a hearing, petitioner neglects to recognize that he did have an opportunity to develop the factual basis of the *Atkins* claim in the motion court, i.e., the state proceedings.

As noted above, Dr. Keyes testified at this evidentiary hearing, as did several of petitioner's relatives, a friend and tutor, and a special school district teacher. The state presented several witnesses, including a certified examiner employed by the state department of corrections, two psychologists, and a special school district teacher. The motion court also considered the trial evidence, which included the

testimony of petitioner's experts (Dr. Schultz, Dr. Wetzel, Dr. Rabun) and petitioner's voluminous records from the special school district, which included his prior IQ tests (summarized in table at 191 S.W.3d at 30 and in memorandum of motion court at 25).

The Court agrees with the state that petitioner raised an *Atkins* claim in his amended post-conviction relief motion and in his Rule 91 state habeas petition, that the evidentiary hearing in the motion court was "extensive," and that petitioner had a full and fair opportunity to litigate the *Atkins* claim in the motion court. The request for an evidentiary hearing is denied.

<u>Grounds for Relief</u>

Petitioner's principal argument is that petitioner is entitled to a jury trial on the issue of mental retardation (grounds G, H and I). Petitioner claims that he is constitutionally entitled to a determination by the jury (or the trial judge if the jury is waived), not by the motion court, on the issue of whether he is mentally retarded (ground G) (issue of which court is the fact-finder), which the state must prove beyond a reasonable doubt (ground H) (issues of burden of proof and standard of proof), and that clear and convincing evidence shows that petitioner is mentally retarded (ground I) (low IQ scores and poor adaptive skills manifested before age 18).

The state argues that procedural default bars petitioner's claims that he was entitled to a jury determination of the issue of mental retardation (ground G) and that the state must prove that fact beyond a reasonable doubt (ground H) because petitioner did not raise these claims in his post-conviction relief motion or on appeal from the denial of that motion. According to the state, petitioner cannot show either cause and prejudice, or manifest injustice (or actual innocence), to excuse the procedural default. Petitioner did raise these claims in his Rule 91 state habeas petition, but the state contends that the Rule 91 state habeas petition cannot overcome the earlier failure to raise the claims on direct appeal or in post-conviction relief proceedings, citing Charron v. Gammon, 69 F.3d 851, 857 (8ᵗʰ Cir. 1995).

In the traverse, petitioner argues that cause and prejudice excuse his failure to raise the Atkins issue at trial, on direct appeal, in the motion for post-conviction relief, or on appeal from the denial of that motion. Petitioner argues on the merits that the state Supreme Court's decision that he is not mentally retarded is an unreasonable application of applicable Supreme Court law and an unreasonable determination of the facts in light of the state court record.

Petitioner could not have raised the *Atkins* claim earlier because *Atkins* had not yet been decided. Petitioner did raise the *Atkins* claim in his Rule 91 state

habeas petition, which was the earliest opportunity he could have done so in the state courts. Petitioner argues on the merits that the Missouri Supreme Court unreasonably applied applicable Supreme Court law when it arbitrarily refused to remand his case for a new penalty phase hearing, *citing Hicks v. Oklahoma*, 447 U.S. 343 (1980), *and Rust v. Hopkins*, 984 F.2d 1486 (8th Cir. 1993), *and Johnson v. State*, 102 S.W.3d 535. Petitioner also argues that the state Court's decision upholding the motion court's finding that he is not mentally retarded unreasonably applies applicable United States Supreme Court law on which party has the burden of proof on the issue and the standard of proof, and is an unreasonable determination of the facts in light of the state court record.

The state's position is that there is no federal constitutional right to a jury determination of the issue of mental retardation in a capital case, *citing Schriro v. Smith*, 546 U.S. 6, 7 (2005) (per curiam). The state also argues that "*Atkins* does not require, as a constitutional matter, the government to prove—again, by any standard, much less beyond a reasonable doubt—that a capital defendant is not mentally retarded." *United States v. Webster*, 421 F.3d 308, 311-12 & n.10 (5th Cir. 2005) (Federal Death Penalty Act) (noting several states post-*Atkins* placed burden on capital defendants to prove by a preponderance of the evidence that they are mentally retarded), *cert. denied*, 549 U.S. 828 (2006). The state further argues that Misouri thoroughly reviewed the evidence presented and correctly analyzed the legal precedents in finding that petitioner is not mentally retarded (ground I). Accordingly, the Missouri Supreme Court reasonably applied the applicable law.

The state also argues that trial counsel was not ineffective for failing to adequately investigate and present evidence on the issue of mental retardation or to select another expert on mental retardation (ground N).

*Schriro v. Smith*, 546 U.S. 6, supports the state's argument on the merits. In *Schriro*, an Arizona jury convicted the defendant of first-degree murder and other offenses in 1982. He was sentenced to death. The convictions and sentence were affirmed on direct appeal, and petitions for post-conviction relief were not successful. The defendant then filed a federal habeas petition. The defendant did not argue in any of these proceedings that he was mentally retarded or that his mental retardation made him ineligible for the death penalty. However, the defendant did present evidence in mitigation during the sentencing phase of his trial showing that he had low intelligence. The district court denied the federal habeas petition in 1996. Following multiple appeals and remands, and the *Atkins* decision, the defendant asserted in his appellate briefs that he was mentally retarded and ineligible for execution under *Atkins*. The Ninth Circuit ordered suspension of all federal habeas proceedings and directed the defendant to "institute proceedings in the proper trial court of Arizona to determine whether the state is prohibited from executing [the defendant] in accordance with *Atkins*. The court of appeals further ordered that "the issue whether [the defendant] is mentally retarded must be determined . . . by a jury trial unless the right to a jury is waived by the parties." Id.

- 45 -

at 7, <u>citing</u> App. to Pet. for Cert. A-2.

The United States Supreme Court vacated the judgment of the court of appeals and remanded the case. The United States Supreme Court held that the court of appeals "erred in commanding the Arizona courts to conduct a jury trial to resolve [the defendant's] mental retardation claim." <u>Id.</u> "*Atkins* stated in clear terms that 'we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Id., citing Atkins*, 536 U.S. at 317 (modifications in original). The Court further observed that "States, including Arizona, have responded to that challenge by adopting their own measures for adjudicating claims of mental retardation" and that "Arizona had not even had a chance to apply its chosen procedures when the [court of appeals] pre-emptively imposed its jury trial condition." *Id.*

In the present case, Petitioner acknowledges the U.S. Supreme Court's finding regarding state enforcement of the constitutional restriction. In *Johnson v. State*, 102 S.W.3d 535 (Mo. 2003), as in the present case, the defendant was tried, convicted and sentenced to death, and the conviction and sentence were affirmed before *Atkins*. In both cases, the trial evidence of mental retardation was disputed. In both cases, the motion court considered evidence of mental retardation and expert testimony. In *Johnson*, however, the Missouri Supreme Court ordered the

- 46 -

issue of mental retardation to be resolved in a new penalty phase trial by a jury, and not by the motion court. 102 S.W.3d at 541. (After a third penalty-phase trial, the jury found that the defendant was not mentally retarded; the death penalty was imposed, and the Court affirmed the sentence. *Johnson v. State*, 244 S.W.3d 144 (Mo. 2008) (banc) (*Johnson IV*) (opinion filed Jan. 15, 2008).)

Petitioner argues that in the *Johnson* case the state developed an "appropriate way" to enforce *Atkins*, at least for cases tried before *Atkins* and in which *Atkins* was raised in post-conviction relief proceedings. Once the defendant makes a submissible case of mental retardation, the remedy developed in *Johnson* was to set aside the death sentence as excessive and remand for a new penalty phase hearing before a jury, unless the defendant waives a jury. Petitioner argues that because his case is materially indistinguishable from *Johnson*, the state arbitrarily denied him a new penalty phase trial and jury determination on the issue of mental retardation, in violation of due process.

Ordinarily, habeas review of the claim that petitioner has a right to a jury trial of the *Atkins* issue would be barred by procedural default because petitioner failed to raise it in his motion for post-conviction relief or on appeal from the denial of post-conviction relief in the state courts. The state correctly argues that the Rule 91 state habeas petition cannot overcome the procedural default. *See, e.g., Charron v.*

*Gammon*, 69 F.3d 851, 857 (8th Cir. 1995). However, in the present case, *Atkins* and the "appropriate way" to enforce *Atkins* did not arise until after petitioner could have raised the issue in post-conviction relief proceedings. On the merits, the state argues that petitioner has no right to a new penalty phase hearing, much less a jury trial, of whether he is mentally retarded. (Grounds G, H) The state also argues that the state Court reasonably applied Supreme Court precedents and that the record evidence supports the state courts' decision that petitioner is not mentally retarded. (Ground I)

The *Johnson* case and this case can be distinguished. In the present case, the motion court and the state supreme court found that petitioner failed to make a submissible case of mental retardation; in contrast, in *Johnson*, the defendant indeed made a submissible case and thus raised a "genuine dispute" about his mental retardation. 102 S.W.3d at 541 (jury issue).

The decision rendered by the Supreme Court of MIssouri rejecting the claim that petitioner has a constitutional right to have a new penalty phase trial and a jury determine whether he is mentally retarded was not contrary to, and did not involve an unreasonable application of, clearly established federal law as determined by the Supreme Court, 28 U.S.C. § 2254(d)(1). *Cf. In re Parkus*, 219 S.W.3d 250, 255 (Mo. 2007) (banc) (petitioner was tried, convicted and sentenced to death before

*Atkins* and *Johnson; Atkins* issue was raised by petition for writ of mandamus as a challenge to competency to be executed; Missouri Supreme Court characterized case as "a court-tried case without a jury in a civil matter" and applied general standard of review).

In *Johnson IV* the state Supreme Court interpreted Mo. Rev. Stat. § 565.030.4(1), which provides that life imprisonment shall be assessed "[i]f the trier finds by a preponderance of the evidence that the defendant is mentally retarded," to "necessarily impl[y] that it is the defendant's burden, not the State's, to prove to a jury that he is mentally retarded." 244 S.W.3d at 150. The state Supreme Court rejected the argument that *Atkins* and *Ring v. Arizona* require that any facts that are necessary to put a defendant to death must be found by a jury beyond a reasonable doubt. Id. at 151. It explained that

> [d]etermining a defendant is mentally retarded is not a finding of fact that increases the potential range of punishment; it is a finding that removes the defendant from consideration of the death penalty. The Supreme Court's holding in Ring requiring a jury to find statutory aggravating circumstances beyond a reasonable doubt does not apply to the issue of mental retardation.

*Id.* The Court further noted that "Missouri follows 30 states in requiring that the defendant prove mental retardation." *Id.* at 150 n.3 (listing states; most states have addressed the issue by statute; in some states, courts have addressed the issue in the absence of legislative action; *e.g., Ex parte Briseno*, 135 S.W.3d 1 (Tex. Ct. Crim.

App. 2004)); *see also In re Hawthorne*, 35 Cal. 4ᵗʰ 40, 47, 24 Cal. Rptr. 3d 189, 105 P.3d 552 (2005) (post-conviction procedure); *State v. Lott*, 97 Ohio St. 3d 303, 779 N.E.2d 1011 (2002) (per curiam) (holding post-conviction *Atkins* claim was disputed factual issue best resolved by trial court, in manner comparable to a ruling on competency), <u>cert. denied</u>, 538 U.S. 1010 (2003).

Moreover, is the Missouri Supreme Court's finding that petitioner is not mentally retarded based on an unreasonable determination of the facts in the state court proceeding? 28 U.S.C. § 2254(d)(2). The evidence of mental retardation was disputed. Three defense experts testified at trial that petitioner's IQ scores did not meet the "significantly subaverage intellectual functioning" level required for mental retardation. Rather, the defense experts agreed that petitioner was of "borderline intelligence" and not mentally retarded. Only one expert, whose opinion was discounted by the motion court and the Supreme Court, testified that petitioner was mentally retarded. Grounds G, H and I are denied.

Habeas review of petitioner's confrontation clause objection to the police officer's testimony about the victim's statement in the hospital (ground E) is barred by procedural default. On direct appeal petitioner argued the statement was inadmissible hearsay and was inadmissible as a dying declaration because no evidence suggested that the victim believed herself to be in danger of dying; the

defense did not object at trial, and the state supreme court found no plain error. 43 S.W.3d at 818-19 (noting statement was cumulative in light of petitioner's oral confession). Petitioner's brief on direct appeal did not cite the confrontation clause nor confrontation clause cases, and thus did not "fairly present" the claim to the state courts. Petitioner has not shown cause and prejudice, or manifest injustice, in order to excuse the procedural default.

Notwithstanding the procedural default, the confrontation clause argument must fail because *Crawford v. Washington*, 541 U.S. 36, 54 (2004), which holds that the sixth amendment bars a witness's testimony against a criminal defendant unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination, is considered a "new rule" for purposes of *Teague v. Lane*, 489 U.S. 288 (1989), and therefore does not apply retroactively on collateral review. *See Whorton v. Bockting*, 549 U.S. 406 (2007). In addition, the admission of the victim's hospital statement was not "so conspicuously prejudicial or of such magnitude that it fatally infected the trial and deprived [petitioner] of fundamental fairness." *Manning-El v. Wyrick*, 738 F.2d 321, 323 (8th Cir.), cert. denied, 469 U.S. 919 (1984). The Supreme Court of Missouri noted the victim's hospital statement was merely cumulative to other evidence properly admitted, including petitioner's oral confession. 43 S.W.3d at 818. Ground E is

denied.

Habeas review of the prosecutor's alleged improper closing arguments during the penalty phase (Ground J) is barred by procedural default. The defense did not object at trial and the issue was not raised until the appeal of the denial of post-conviction relief. Likewise, the related ineffective assistance of counsel claim (Ground T) was not raised in the state courts at all. Petitioner has not shown cause and prejudice, or manifest injustice, in order to excuse the procedural default. Grounds J and T are denied.

Habeas review of whether the failure to disclose the Krabbenhoft interview violated <u>Brady v. Maryland</u> is barred by procedural default (Ground A). Petitioner raised this issue on direct appeal but not on appeal from the denial of post-conviction relief. Petitioner did argue in the appeal from the denial of post-conviction relief that trial counsel was ineffective for failing to investigate and call Krabbenhoft to impeach Hall (Ground P), but the Supreme Court held that the issue had been raised as part of the prior appeal and could not be relitigated, even on a different theory, during a post-conviction proceeding. 191 S.W.3d at 35-36. Petitioner has not shown cause and prejudice, or manifest injustice, in order to excuse the procedural default. Grounds A and P are denied.

Petitioner argues that he was denied due process because the prosecutor

improperly cross-examined Dr. Schulz about racist remarks he made during an interview (Ground B); about past crimes (Ground C); and because the transcript of his oral statement to the police suggested his involvement in another homicide (Ground D).  The state supreme court reviewed Ground B for plain error, 43 S.W.3d at 814-15, and Ground C and D on the merits, id. at 815-16.  These claims involve matters of state law and the contested evidence was not so conspicuously prejudicial or of such magnitude that it fatally infected the trial and deprived petitioner of fundamental fairness.  Grounds B, C and D are denied.

Petitioner also argues that he was denied due process because there was insufficient evidence that he acted knowingly (Ground F).  The state Supreme Court rejected this argument on direct appeal, 43 S.W.3d at 816, and on appeal from the denial of post-conviction relief, 191 S.W.3d at 37 (discussed in connection with Claim E that trial counsel was ineffective for failing to investigate and present evidence to rebut suggestion that petitioner intended to kill the victim and deliberated on the killing).  The state Court decision on this claim was not contrary to and did not involve an unreasonable application of clearly established federal law as determined by the United States Supreme Court, and was not based on an unreasonable determination of the facts in the state court proceeding.  As found by

that Court, any rational juror could have found beyond a reasonable doubt that

petitioner knew his actions (shoving an elderly woman down stairs, hitting her in

the head several times with a hammer) were practically certain to cause death.  43

S.W.3d at 816 (*citing State v. Mallett*, 732 S.W.2d 527, 533 (Mo. 1987) (banc)

(intent to kill can be inferred from use of deadly weapon on some vital area of

victim's body)); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979).   Ground F is

denied.

Petitioner also argues that his death sentence is unconstitutional because the

evidence was insufficient to prove two statutory aggravating circumstances (murder

committed while the victim was helpless; murder committed during attempted

forcible sodomy) (Ground K) and because killing a helpless victim is not  a listed

statutory aggravating circumstance in Rev.Stat. Mo. § 565.030.2 (Ground L).  The

state Court held that a reasonable juror could have found from the evidence both

challenged statutory aggravating circumstances beyond a reasonable doubt.  43

S.W.3d at 818-19 (jury found murder was unreasonably brutal, and involved

burglary and attempted forcible sodomy).  It also held that the instruction issue had

not been preserved for appellate review and found no plain error. *Id.* at 819.  It

further found and held that the possibility that the jury's having found one invalid

aggravating circumstance made it much easier for the jury to find each subsequent

aggravating circumstance did not establish manifest injustice. *Id.* (noting that the

death sentence will be affirmed if the jury finds one valid statutory aggravating

circumstance and, here, the jury found two independent statutory aggravating

circumstances, burglary and attempted forcible sodomy); *see Brown v. Sanders*, 546

U.S. 212, 220 (2006) (holding an invalidated sentencing factor will render the

sentence unconstitutional by reason of its adding an improper element to the

aggravation scale in the weighing process unless one of the other sentencing factors

enables the sentencer to give aggravating weight to the same facts and

circumstances), *and Rousan v. Roper*, 436 F.3d 951 (8th Cir. 2006) (applying *Brown*

*v. Sanders* to Missouri law). The state Court decision on these claims was not

contrary to and did not involve an unreasonable application of clearly established

federal law as determined by the United States Supreme Court, and was not based

on an unreasonable determination of the facts in the state court proceeding.

Grounds K and L are denied.

Petitioner also argues that his death sentence is unconstitutional because it

was likely the result of passion, prejudice or some other arbitrary factor, and is

excessive and disproportionate to the sentence imposed in similar cases (Ground

M). The Eighth Circuit has held that the federal constitution does not require

review of "the manner in which the Missouri Supreme Court conducted its [proportionality] review or whether the court misinterpreted the Missouri statute." *Tokarz v. Bowersox*, 198 F.3d 1039, 1062 (8th Cir. 1999) (noting that although state statute requires proportionality review, not the Constitution, "once in place it must be conducted consistently with the Due Process Clause"). The Missouri Supreme Court's proportionality review did not violate due process. 43 S.W.3d at 820-21. Ground M is denied.

Petitioner challenges the effectiveness of trial counsel because trial counsel failed to: adequately investigate and present evidence that petitioner is mentally retarded (Ground N); adequately investigate and present evidence about petitioner's motive (Ground O); adequately investigate and present evidence about the sledgehammer incident (Ground P); adequately investigate and present medical evidence about the victim's injuries and cause of death (Ground Q); adequately investigate and present evidence about petitioner's capacity to plan and deliberate (Ground R); and trial counsel presented inconsistent theories of defense in the guilt and penalty phases (Ground S). As noted above, the motion court held a limited hearing on the ineffective assistance of counsel claim related to the *Atkins* claim (Ground N), but not on the other ineffective assistance of counsel claims (Grounds O-S).

It was found by the Missouri Supreme Court that trial counsel was not ineffective for failing to adequately investigate and present evidence about petitioner's mental retardation and select another expert (Ground N). 191 S.W.3d at 29 (noting counsel consulted three experts who found petitioner was of borderline intelligence but not mentally retarded, counsel was not ineffective for failing to "shop around" for another expert to testify that petitioner was mentally retarded).

The state Supreme Court found that petitioner was not prejudiced by trial counsel's failure to adequately investigate and present evidence to rebut the prosecution's suggestion that petitioner blamed the victim for being evicted from the boardinghouse (Ground O). *Id.* at 34. They found no prejudice because the proposed evidence (documentary evidence and testimony from witnesses) showed only that petitioner may not have been evicted in August, but it did not contradict the prosecution's evidence or the prosecution's theory petitioner held a grudge against the victim based on other altercations. *Id.* at 35.

The state Supreme Court held that the claim of trial counsel as ineffective for failing to adequately investigate and present evidence about the sledgehammer incident (Ground P) had been raised as part of the direct appeal (as a *Brady v. Maryland* violation) and could not be relitigated, even on a different theory, in a post-conviction proceeding. Id. at 35. On direct appeal, that Court held that the

Krabbenhoft interview did not impeach Hall's testimony about the sledgehammer incident and that there was no <u>Brady</u> violation. 43 S.W.3d at 813.

The state Court found petitioner was not prejudiced by trial counsel's failure to adequately investigate and present medical evidence about the victim's injuries and cause of death (Ground Q). 43 S.W.3d at 36-37. No prejudice was found because

> [the pathologist's] testimony would not have refuted the jury finding that [petitioner] killed [the victim] by beating her, shoving her down the stairs, and striking her head with a sledgehammer. It would only have reapportioned the amounts of damage done by each of [petitioner's] actions and confirmed that [the victim] had some contributing health problems. . . . [The pathologist's] testimony does not undercut the State's evidence that [petitioner] beat [the victim] and hit her with a sledgehammer.

> *Id.*

As to Ground R, the Missouri Court agreed with the motion court that the proposed witnesses "could not have testified to what [petitioner] was thinking at the time of the murder" and that their testimony would have been cumulative because "this evidence was presented through . . . Dr. Schulz [who] testified at trial that [petitioner] was easily confused and could not foresee consequences." 43 S.W.3d at 38.

It was found by the Missouri Court that trial counsel was not ineffective for presenting inconsistent theories of defense in the guilt and

penalty phases (Ground S). 43 S.W.3d at 39. "During the guilt phase, . . .

Dr. Schulz testified that, as a result of [ mental disease or defect], petitioner

was not able to coolly reflect or deliberate." *Id.* During the penalty phase,

"Dr. Wetzel testified that, although [petitioner] could control his behavior,

his ability to conform his conduct to the law was substantially impaired,

which should be considered as a mitigating factor." *Id.* It was held by

theCourt that "[t]his is not a case of counsel arguing a 'he didn't do it'

defense and a 'he is sorry he did it' mitigation, which would be

impermissible." *Id.* at 39. They explained that

> [t]he change in expert testimony after conviction was simply a
> retooling of his argument. The jury had just rejected [petitioner's]
> argument that he was not responsible for the murder because of his
> mental state. It was not error for counsel to then argue that, even
> though the jury found that his mental state was not sufficient to excuse
> him, it should still consider his mental state to mitigate his punishment.

*Id.* at 39-40.

Claims of ineffective assistance of counsel are evaluated under the

framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).

> To establish that his trial counsel was constitutionally
> ineffective, a habeas petitioner must show that his counsel's
> performance was deficient and that he was prejudiced by this
> deficiency. Counsel's representation was deficient if it "fell below an
> objective standard of reasonableness," and the petitioner was
> prejudiced by this deficiency if "there is a reasonable probability that,
> but for counsel's unprofessional errors, the result of the proceeding

would have been different." Trial counsel's representation is entitled to a strong presumption of reasonableness, and [the habeas court] must not examine counsel's conduct with the aid of hindsight lenses that bring into focus what counsel's best course of action would have been. [T]rial counsel's reasonable trial strategies cannot constitute ineffective assistance, even if they are unsuccessful. . . . [T]he factual findings of state courts, both trial and appellate, are presumed to be correct.

*Flieger v. Delo*, 16 F.3d at 886 (citations omitted).

The High Court of this state concluded that trial counsel's performance was not deficient (for failing to investigate whether petitioner was mentally retarded (Ground N) and for presenting inconsistent defenses (Ground S)) or petitioner was not prejudiced by counsel's deficiencies (for failing to investigate petitioner's motive (Ground O), the sledgehammer incident (Ground P), medical evidence (Ground Q), and petitioner's capacity to plan and deliberate (Ground R)). Applying the *Strickland* standard, the Court concludes that the state court decisions on these claims were not contrary to, and did not involve an unreasonable application of, clearly established federal law as determined by the United States Supreme Court, and was not based on an unreasonable determination of the facts in the state court proceeding. Claims N-S are denied.

## Conclusion

Based upon the foregoing analysis, petitioner is not entitled to habeas relief under 28 U.S.C. § 2254.

Accordingly,

**IT IS HEREBY ORDERED** that the petition of Paul T. Goodwin for writ of habeas corpus pursuant to 28 U.S.C. § 2254 [Doc. No. 11] and the request for an evidentiary hearing [Doc. No. 19] are denied. The state's motion to dismiss the petition as untimely filed [Doc. No. 20, part III] is denied.

**IT IS FURTHER ORDERED** that petitioner has not made a substantial showing of the denial of a constitutional right and the Court will not issue a certificate of appealability. "A substantial showing is a showing that a court could resolve the issues differently, or the issues deserve further proceedings." Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997), cert. denied, 525 U.S. 834 (1998).

A separate judgment in accordance with the Memorandum and Order is entered this same date.

Dated this 30th day of September 2009.

_____
    HENRY EDWARD AUTREY
    UNITED STATES DISTRICT  JUDGE